No. 3205

Second Circuit

MILLER v. MO. PAC. R. R. CO. ET AL.

(November 8, 1928.  Opinion and Decree.)
(November 24, 1928.  Rehearing Refused.)
(January 28, 1929.  Writ of Certiorari and Review Refused by Supreme Court.)

Overton & Hunter, of Alexandria, attorneys for plaintiff, appellee.

Henry Bernstein, of Monroe, Hawthorn & Stafford, of Alexandria, Hudson, Potts, Bernstein & Sholars, of Monroe, and Peterman, Dear and Peterman, of Alexandria, and Spencer, Gidiere, Phelps and Dunbar, of New Orleans, attorneys for defendants, appellants.

ODOM, J. The plaintiff in this suit asks judgment for $35,000.00 against the Missouri Pacific Railroad Company and the Texas & Pacific Railway Company in solido for personal injuries which he received while at work as Engine Foreman for the Texas & Pacific Railway Company on March 22, 1925.

He alleges that while at work in charge of a switch engine belonging to the Texas & Pacific Railway Company, in the switch yards at Alexandria, Louisiana, he was struck and run over by a Missouri Pacific switch engine and seriously and permanently injured; and that he himself was guilty of no fault or negligence, but that the accident and injury were brought on solely through the fault and negligence of the defendant railroad companies.

The switch yards at Alexandria, where the accident occurred, are owned, it seems, by the Texas & Pacific Company, but, under an arrangement between the two companies, they were used and operated jointly and, it is conceded, that if there is liability on the part of either company, they are both liable. It is agreed that as both roads were engaged in interstate commerce at the time of the accident, the provisions of the Federal Employers' Liability Act (45 U. S. C. A., Pars. 51-59) are applicable.

In addition to the main line of the Texas & Pacific Railway Company, which runs through the yards at Alexandria, there are numerous switch tracks and among them one known as "Texas & Pacific No. 2", which runs parallel with the main line and, approximately ten feet from it. On the morning of the accident, plaintiff was ordered by the Yard Foreman to switch three cars from the main line to a switch track called "Short No. 1", which branches off from the main line at a point about 400 feet south of the south edge of Murray Street and on the opposite side from "T. & P. No. 2." Plaintiff picked up the three cars, which he was ordered to switch over to "Short No. 1," in the yards north of Murray Street, which crosses the main line and switch track at right angles, and proceeded south across Murray Street on the main line, riding on the front end of the engine. At the same time, the switch engine belonging to the Missouri Pacific was following in the same direction on "T. & P. No. 2". At some point, the exact location of which is in dispute, between Murray Street and where "Short No. 1" branches off from the main line, plaintiff stepped from his engine, which was running about eight miles per hour, to the ground in the space between the main line, on which his engine was running, and "T. & P. No. 2," on which the Missouri Pacific engine was running. When he stepped to the ground, he stumbled and fell over towards "T. & P. No. 2" track and was hit by the end of the pilot beam of the Missouri Pacific engine, knocked over on the track in front of the engine and was run over.

Plaintiff alleged and testified that he was caused to stumble by the presence of loose, washed gravel on the surface of the pathway between the two tracks, which gravel had been negligently allowed to accumulate in said spaces by the defendant companies.

Counsel for plaintiff in brief says:

"The main, if not the only, issue involved is whether or not defendants were guilty of any actionable negligence in the operation of the Missouri Pacific engine and in allowing the gravel to accumulate at the point where Miller alighted from his engine."

It will thus be seen that, according to the view of plaintiff's counsel, this case

hinges on the question of negligence. Accepting plaintiff's theory of the case, we shall consider it from that standpoint.

It is needless to recount all the points of negligence which plaintiff in his petition charged against these defendants, as all of them have either been abandoned or not pressed before this Court, except two, which are as follows:

First: that the defendant companies were negligent in allowing loose gravel to accumulate between the tracks and in the paths where workmen alighted from moving engines and cars in the switch yards; and

Second: that the defendant, Missouri Pacific Railroad Company, was negligent in running its engine at an excessive rate of speed, and that the members of its crew were careless—paying no attention to their duties.

In addition to these points of negligence charged against the defendant companies, plaintiff invokes the last clear chance doctrine, contending that, if the crew in charge of the Missouri Pacific engine had been keeping the proper lookout ahead and had used proper precautions otherwise, they could and would have seen plaintiff in peril on the track and could have stopped the engine in time to avert the accident.

The defense of the defendant companies is, mainly, that they were guilty of no negligence whatever, either in respect to the loose gravel or the operation of the Missouri Pacific engine. They also set up the defense of assumed risk, the Missouri Pacific especially denying that it had the last clear chance to avoid the accident.

The first point of negligence upon which plaintiff relies is that the defendant companies had permitted loose gravel to accumulate in the space between the two tracks to such an extent that its presence constituted a hazard to those in charge of switching operations in the yards, it being customary for the men to jump on and off moving engines and cars, the theory being that the presence of gravel on the surface of the ground rendered one's foothold thereon less secure.

The facts are that the defendant companies had used loose, washed gravel to ballast the tracks, both main line and switch tracks in the yards. The tracks are slightly elevated above the surface of the ground so that the footpath, or space between them, is lower than the shoulders of the track. The gravel was piled up on the shoulders of said tracks and probably between the rails. It was not intended that any should remain in the space between the tracks, but some of it found its way there, in the ordinary and usual use of the yards by the employees. Counsel for plaintiff correctly state in brief that "the gravel where Miller alighted was loose gravel which had been knocked off the shoulders of the tracks into the path and had not been cleaned up."

In the switch yards, where plaintiff was hurt, those who did the switching were constantly jumping on and off moving engines and cars, and, in doing so, stepped on the loose gravel and kicked or knocked some of it from the shoulders of the track down into the footpath. The gravel, which plaintiff says was in the footpath and which is claimed to have constituted a hazard, and which plaintiff says caused him to stumble and fall, was not dumped into the pathway and allowed to remain. It was scattered over the pathway as a mere incident to the ordinary use of the yards by the employees. It is not charged or contended that it was negligence on the

part of the defendants to ballast the tracks with loose gravel. The particular charge of negligence is that defendants allowed this gravel to accumulate and remain in the footpath.

We are not convinced that the loose gravel on the surface of the ground where plaintiff alighted from his moving engine was necessarily a hazard. It is no doubt true, however, that if the surface of the ground was covered to any considerable depth with loose gravel, one's foothold on the ground, when stepping from a moving train, would be rendered less secure. But we are not convinced that there was enough gravel on the surface where Miller fell to make any material difference. Miller testified that the ground was covered to "a depth of five or six inches," and his testimony on that point is corroborated by two of his witnesses. But the two witnesses had no personal knowledge of the place where Miller alighted from his engine and was hurt. They were taken to the scene by Miller, after he had partially recovered, and were shown the place by him. At the point where Miller says he got off his engine, the ground was covered with gravel to a considerable depth, as he and his witnesses say it was. But we are not convinced that Miller was hurt at that place. He says he stepped off his engine at the "cross-over" track, between the main line and "T. & P. No. 2," at a point about 100 feet from the south edge of Murray Street. At that point, there was an abundance of loose gravel on the ground which had been intentionally placed there and allowed to remain. Farther on south, there was no gravel placed between the tracks, and all that was found there was such as had been kicked or knocked off the shoulders of the track. Our conclusion is that Miller did not step off his engine at the place designated by him, but at a point

considerably farther south, as will be discussed later.

Without going into detail, our conclusion, from a reading of all the testimony, is that the plaintiff stepped from his engine and was hit by the Missouri Pacific switch engine at a place where there was very little gravel on the ground—not enough to constitute a hazard for the employees. It may be said in this connection that no one had ever considered that such gravel as was knocked off the shoulders of the tracks down into the footpath made it dangerous for the employees to step off moving engines and cars. The plaintiff, as well as other employees who had worked in these yards for years, who saw the gravel there every day and knew the conditions perfectly, had continued the practice of jumping on and off moving engines and had apparently paid no attention to the gravel— at least they registered no complaint. The condition of the yards at the time Miller was hurt was not unusual. It was in the same condition that it had been ever since the gravel was first used.

We do not think it was shown that the defendant companies were negligent in permitting gravel to accumulate in these pathways. The testimony shows that the companies maintained a yard crew whose duty it was to go over the yards daily and clean them of rubbish and to throw the gravel from the spaces between the tracks back on the shoulders, and this duty was punctually performed. It can hardly be said that it was the duty of the companies to have someone go through the yards at every hour during the day and pick up the loose gravel from these pathways, as it was thrown there by the employees who used the yards; in view of the fact that the presence of a small amount of gravel itself does not constitute a hazard like the presence of cob-

blestones, clinkers or old cross ties. In view of all the circumstances, our conclusion is that the defendant companies used due care in providing their employees a reasonably safe place to work, and that was all they were required to do.

Counsel for plaintiff have cited several cases from other jurisdictions in support of their contention that it was negligence for these defendants to allow gravel to be on their yards. But a reading of the cited cases will disclose that the distinction between them and the case at bar is marked and manifest. As already stated, the plaintiff in the case at bar was thoroughly familiar with conditions in the yards. He knew that the gravel was there, he helped put it there and saw it there every day, according to his own testimony. If it be said that the presence of the gravel was a hazard, it must be admitted that it was not an unusual hazard.

In Fish vs. Illinois Central Railroad Company, 96 Iowa 702, 65 N. W. 995, cited by counsel for plaintiff, the negligence relied upon was that the defendant company permitted cobblestones "to accumulate and remain on the tracks in the yards." The deceased stumbled over one in the middle of the night and was killed. The condition of the yard was generally good and the presence of the stones an exception and he would not be presumed to know as he came into the yard in the dark of the night that stones had fallen in any particular place.

In the case of Renn vs. Seaboard Airline Railway, 170 N. C. 128, 86 S. E. 964, the plaintiff slipped and fell on ice formed by an overflow from a water tank and which was covered with snow. The particular act of negligence was alleged to be "that defendant negligently permitted and allowed the said ice to be and remain on the ground * * * and become cov-

ered and hidden by snow." The testimony showed that the pumper was negligent in allowing the pump to continue to run and overflow and that the ice formed from the waste water. The ice was permitted to remain and was covered with snow so that the plaintiff could not see it. The defense of assumption of risk was involved and the Court said:

"If the evidence of plaintiff was true, the condition of the place where the plaintiff was injured was not normal, but was unusual, and the plaintiff could not discover it by the exercise of ordinary care."

In the case of So. Ry. Co. vs. Puckett, 16 Ga. App. 551, 85, S. E. 809, the plaintiff stumbled over three large clinkers in the yards, and the particular acts of negligence charged against the defendant were: first, that three large clinkers were on the roadbed; second, that two old cross ties overgrown with grass were lying alongside and near the track; and third, that grass had grown upon the roadbed. The injured employee stumbled over the clinkers, which started him falling, and, in stumbling, he struck his foot against the two old cross ties overgrown with grass, which were on the roadbed near the track. In that case, the Court said it was for the jury to determine whether the injury was caused by the clinkers or the cross ties and the grass which overgrew them.

In the case of Lee vs. Central Railroad, 86 Ga. 231, 12 S. E. 307, the Supreme Court of Georgia held "that the presence of one large clinker of unusual size upon which the brakeman stumbled and was hurt as he stepped from a moving engine in the yards, will not render the company liable for the injury which the brakeman sustained."

In the So. Ry. vs. Puckett case, supra, the Court, in discussing the Lee case, said: "We are not disposed to extend the ruling of the Lee case, supra, so as to hold that

as a matter of law the presence of three or more large clinkers near the track in a railroad yard is not negligence on the part of the railroad company," and expressed the view that it was for the jury to determine that question. But there were other questions of negligence involved in the Puckett case, for the Court said: "We think also it was for the jury to say whether or not the presence of the cross ties, over which plaintiff fell, and the presence of the grass on the roadbed of the defendant company, constituted negligence."

All of the above cases were cited by counsel for plaintiff. In each of the cases the hazard mentioned was an unusual one, and, in some of them, the injured employee had no opportunity to discover them. In the instant case, the presence of the gravel on the yards, if it constituted a hazard at all, was an ordinary one which plaintiff not only had an opportunity to observe, but one with which he was thoroughly familiar, according to his own testimony. He stepped from his train, going north at a speed of seven or eight miles per hour, in broad daylight.

The other point of negligence stressed in the case at bar is that the Missouri Pacific was negligent in operating its switch engine at an excessive rate of speed. We would feel inclined to pass this point without going into details, content with the statement that the testimony does not show that the Missouri Pacific engine was exceeding the speed limit of eight miles an hour, but for the fact that counsel for plaintiff, both in oral argument and in brief, have so earnestly stressed it.

Mike Edmunds, who was in charge of the Texas & Pacific engine from which plaintiff jumped and who saw the accident; Malakowski, a switchman who was riding on the front end of the Missouri Pacific engine, who also saw the accident; Wilder, the engineer in charge of the Missouri Pacific engine; and J. E. Webster, a switchman on the Missouri Pacific engine—all say that the engine was not running over eight miles an hour. These witnesses were at the scene of the accident, three on the Missouri Pacific engine and one on the Texas & Pacific. Mr. Neal, the flagman stationed at the Jackson Street crossing, says he saw the Missouri Pacific engine pass and was asked how fast it was going and said:

"About an average, sometimes they run a little faster than at other times, it depends on the hurry they are in."

As against this testimony, we have that of Lovel DeSoto, who said that the Missouri Pacific engine was going about 22 miles an hour. DeSoto was in the watchtower at Jackson Street, which is about a block and a half from the point where the accident took place. He says that he took note of the speed of the engine when it passed his station and that he continued to watch its movements down the track until the moment of the accident, notwithstanding it was his duty to watch and guard the Jackson Street crossing. Even if DeSoto correctly estimated the speed of the engine when it passed him, we think it improbable that he could have correctly estimated it at the time plaintiff was struck. Then too, in view of other portions of DeSoto's testimony, we are inclined to think he was not observing as closely as he says he was. He says, for instance, that he saw the accident and described it in detail; says he saw the plaintiff when he alighted from his engine and saw the pilot beam of the Missouri Pacific engine hit him on the hip and knock him in front of the engine and, further, that when plaintiff alighted from his engine, it was standing still. On this latter point, he contradicted the tes-

timony, not only of Miller, the plaintiff, but of every other witness who testified on that point, Miller and all the others saying that the Texas & Pacific engine was moving at about 8 miles an hour when plaintiff jumped off.

These are the only witnesses who testified directly on this point. We, therefore, find four witnesses, who were at the point where the accident happened, all testifying that the Missouri Pacific engine was not exceeding 8 miles per hour, one who says it was going at an average rate of speed, and one, DeSoto, who says it was going at 22 miles. These who were at the scene and in charge of the engines were in a position to know, if anyone did, the speed of the engines, and we see no reason to discredit their testimony. We cannot disregard it and accept the testimony of De Soto who was not, we think, in position to know.

The plaintiff says that he was dragged under the engine for a distance of 200 feet, and counsel for plaintiff contend that this shows that the engine was moving rapidly, otherwise, it could have been stopped in a less distance.

There are three witnesses who swore that plaintiff was dragged 200 feet—the plaintiff, Hudson and DeSoto. Plaintiff could not know how far he was dragged, except by measuring the distance from the point where he says he was struck to the place where the engine stopped, and, if he be incorrect as to the point where he was struck—and we think he is, he is also mistaken as to how far he was dragged.

Hudson was in his automobile going east on Lee Street, which crosses the railroad tracks at about right angles one block south of Washington Street. He says that when he reached the railroad crossing, he stopped just a moment and looked both ways, and that when he looked north, in the direction from which the engine was coming, he saw a man under the engine being dragged. He says the engine stopped about 60 feet north of Washington Street, or a distance of more than 400 feet (including the width of the streets) from where he was, so that, if plaintiff was dragged 200 feet, he must have been hit more than 600 feet from where Hudson was sitting in his car. If he stopped for only a moment, as he says he did, we do not think he was in a position to correctly estimate the distance which plaintiff was dragged. The same may be said of the testimony of DeSoto who was at the Jackson Street crossing, much farther away.

As against the testimony of these witnesses, there is that of Edmunds, Malakowski, Wilder, Hoffman and Hymes, each of whom was on one or the other of the engines, who swore positively that the engine was stopped within a distance not exceeding 40 feet from the point where it was when plaintiff fell under it. All of the testimony shows that Malakowski was riding on the front end of the Missouri Pacific engine and saw the accident, and that the moment he saw the plaintiff fall under the engine, he jumped off and exclaimed to Wilder, who was in charge of the engine —"We have run over Zack." Miller himself heard this exclamation. Wilder at once shut off the steam and applied the brakes. Miller says he heard the brakes go on. The brakes were in good condition and the engine was stopped as soon as possible, and the testimony shows that if it had been going 20 miles per hour, it could have been stopped within 60 feet, and, at a speed of 10 miles, in less than 40 feet. Wilder says he did all he could to stop the engine and we have no doubt that he did. Human instinct would impel him to stop the engine as quickly as possible when

he knew that there was beneath it a fellow laborer liable to be ground into pulp.

Another circumstance which should be considered in this connection is that the Texas & Pacific engine, from which plaintiff alighted, was stopped by Edmunds within about the same distance as the Missouri Pacific was stopped. Edmund's engine was admittedly running 7 or 8 miles an hour, and slightly in advance of the other. Edmunds saw the accident and applied his brakes and stopped about 40 feet from Washington Street; and the Missouri Pacific engine stopped within approximately 60 to 65 feet from that street.

But counsel say that the Missouri Pacific engine was, at least, 125 feet behind the Texas & Pacific when plaintiff stepped to the ground, which supports the theory that he was dragged so far, and also the theory that the crew in charge of the Missouri Pacific engine had the last clear chance to avert the accident. But Miller's own testimony sets both points at rest adversely to his contentions.

Miller says that he was riding on the running board of his engine near the front end on the side next to the track on which the other engine was running; that he stepped to the ground, lost his balance, and took two or three steps diagonally across towards the other track, when he was hit on the hip by the end of the pilot beam of the Missouri Pacific engine. The pilot beam of the engine extends over the track about eighteen inches, and the board from which plaintiff alighted extends over the track about the same distance, so that the space between the point where Miller was standing and the pilot beam of the other engine, is approximately seven feet wide. Miller says he took only two or three steps before he was struck. It follows therefore, necessarily, that he was hit

almost instantly after stepping to the ground, and that the engine which struck him was almost upon him when he stepped off. It could not have run any appreciable distance before striking him. Miller says if the engine had not been going so fast, he could have gotten up after he fell to the ground and gotten out of the way. But he did not stumble and fall over on the track in front of the engine—he says he was hit by the end of the pilot beam and knocked over in front of the engine. It is perfectly evident, we think, that the Missouri Pacific crew could not have seen him in time to avert the accident, and they could not have anticipated that he would get off where he did.

Reverting to the question as to where the plaintiff alighted from his engine, we think he did not get off at the "cross-over" track, but farther south. This point is material because on or near the "cross-over" there was considerable gravel all over the ground, whereas farther south there was but little, such as had been scattered as an incident to the use of the ground during the preceding 24-hour period. As has already been stated, the Missouri Pacific engine was stopped at a point about 60 feet from the Washington Street crossing. It ran, we think, not exceeding 50 or 60 feet after the pilot beam struck the plaintiff. He was hit within a few feet, say, two or three steps from where he alighted. Adding these distances, locates the point where he got off at approximately 125 or 135 feet—not over 150 feet, from the line of Washington Street.

The testimony of the witnesses on both sides is conflicting on this point. However, none of them who was in a position to know attempted to locate the point definitely, going no further than to say that it was nearer Washington Street than Murray Street. Plaintiff's witnesses, Ethridge

and Gernaught, made measurements showing that the place was at the "cross-over," nearer Murray Street. But they did not witness the accident, and only had the point shown them by plaintiff sometime after the accident.

We have stated that we think the defendant companies used reasonable diligence in clearing the yards of loose gravel and that, under the circumstances, it was not their duty to go over the yards more often than they did for that purpose, and, further, that we are not convinced that the presence of the amount of gravel where plaintiff alighted from his engine was necessarily a hazard. However, if it be said that the gravel was a hazard and that, as a matter of law, defendants were negligent in allowing it to be there under the circumstances, there is then involved the defense of assumed risk, which is especially pleaded and stressed by the defendants. Their brief on that point is exhaustive.

Counsel for plaintiff, in a supplemental brief just filed, state:

"As we view the defense of this case, it rests entirely upon the contention that Miller assumed the risk of .the hazards contributing to his injury."

And then state:

"He (plaintiff) can not be said to have impliedly agreed to run the risk of any unusual or extraordinary hazards unless he has full and complete knowledge of them and appreciates their danger at a time and under such circumstances that there is a freedom of choice as to remaining in the employment."

They further state that the conditions in the yards on the morning plaintiff was hurt were unusual and that—

"We have assumed in this argument that Miller had no previous knowledge of the fact that there was gravel in the path at the point where he alighted, or at any other point .in the yards where a path was maintained. We know this to be a fact, and the record establishes it as a fact beyond any doubt."

As to Miller's knowledge of conditions on the day he was injured, counsel call our attention to his testimony, found on page 88 of the record, as follows:

"Q. Do you recall whether the path continued from where it started between the tracks on down to Washington Street?
"A. Yes, sir, it did, it was that day before; I did not know the condition of the tracks that day but that there had been a path from there on down to Washington Street before that."

We cannot accept this one statement that he did not know the conditions on that day in view of his other direct and unequivocal statement to the contrary. We quote from his testimony, beginning on page 37 of the record, as follows:

"Q. Your testimony is that in frequently going past this locality where you were injured on the 22d day of May, 1925, you saw that there was loose gravel, washed gravel, between the two tracks?
"A. Yes, sir.
"Q. You had been seeing it there for some time?
"A. Yes, sir.
"Q. You knew it was there on the morning you were injured?
"A. Yes, sir.
"Q. You knew that it was at that very point when you stepped off of your engine, did you?
"A. Yes, sir.
"Q. Did I understand you to say that the gravel at this .place was heaped up or piled up between the tracks?
"A. No, sir.
"Q. Spread out?
"A. Spread out between the tracks.
"Q. Was it spread—at what distance was it spread between the tracks?
"A. The entire distance between the tracks."

As to whether plaintiff knew and appreciated that the presence of the gravel was a hazard and might cause him to stumble, we quote his testimony found on page 45 of the record, as follows:

"Q. Didn't you know that when you stepped off into loose washed gravel, you would have to stumble and fall?
"A. Every time you step off you don't stumble.
. "Q. Didn't you know you are apt to stumble and fall?
"A. I won't say that.
"Q. Didn't you know that you might stumble and fall?
. "A. Yes, sir."

And the following from page 55 of the record:

"Q. And if you had not stepped off into the loose gravel that you saw there, you would not have stumbled?
"A. No, sir.
"Q. And you did know when you stepped off that you might stumble, didn't you?
"A. I knew that I was just as apt to stumble there as I would farther down the ground, I was liable to stumble anywhere that there was loose gravel, that's reasonble."

Therefore, these points are definitely established by the testimony of Miller himself, first, that Miller knew that there was gravel on the yards at the point where he alighted, as well as all over the yards; that he had helped put it there; that it was at the identical point where he alighted on the morning he was hurt; and second, that he knew and appreciated the danger of stepping off into the loose gravel.

Miller was an experienced man who had been employed as Switch Engine Foreman to work in these yards for many years; he had been in the railroad service for about 26 years; he knew every detail in connection with the switching of engines and cars in the yards and as to how they were kept up; he knew that there were many switch tracks running through these yards and that there were some thirteen engines constantly traversing these tracks; and he knew that one might be expected at any point, on any of the tracks, at any time. Yet, he did not hesitate to continue his employment under the conditions as he knew them to exist, and, so far as the record discloses, registered no complaint.

This accident happened in broad daylight, at a place in the yards where there was nothing on the ground, except what was usually there—there were no stones larger than the usual over which he stumbled.

It is needless to refer to all the cases cited by counsel in their briefs. Both sides have cited and quoted from the case of Cincinnati, N. O. & T. P. Ry. Co. vs. Thompson, (C. C. A.) 236 Fed. page 1, decided in 1916. In an exhaustive opinion which the Court cited the leading cases in point, it held the law to be (quoting the syllabus):

"1. For a servant to assume the risk, it must appear that he had knowledge of the defective condition out of which the risk arose, and appreciated the danger arising therefrom.
"2. An employee assumes risks attributable to his employer's negligence where they are plainly observable, though he did not know of them."

On the merits of the case before the Court, it held:

"That a brakeman injured when he stepped on a large piece of slag in alighting from a moving train, knew that there were smaller pieces of slag on the roadbed, does not as a matter of law establish that he assumed the risk of injury from the presence of such larger pieces, for the danger from them must be deemed substantially greater than the danger from the smaller ones."

In the cited case, a judgment in favor of the plaintiff was sustained because the

testimony showed that whereas he was aware of the presence of the smaller pieces of slag scattered over the ground, yet he was not aware of the presence of the larger pieces over which he stumbled, the Court holding that his knowledge of the presence of the smaller pieces did not imply a knowledge of the presence of the larger pieces. In the case at bar, there were no large or unusual rocks on the ground— the plaintiff having stumbled over gravel, which he knew was there.

There was judgment in the lower court in favor of plaintiff, which judgment we think is manifestly erroneous; and it is accordingly reversed and plaintiff's demands are rejected, at his costs.